IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Michelle R. Notestone-Spangler, :

    Plaintiff, :

  v. :    Case No. 2:09-cv-0158

Michael J. Astrue, :    JUDGE FROST
Commissioner of Social Security,
                                    :

    Defendant.

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Michelle R. Notestone-Spangler, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. The applications, which were filed on September 22, 2004, alleged that plaintiff became disabled on September 14, 2004, as a result of spinal stenosis, hypertension, asthma, non insulin dependent diabetes mellitus, migraines, and gastroesophageal reflux disease.

After initial administrative denials of her claim, plaintiff was afforded a video conference hearing before an Administrative Law Judge on February 4, 2008. In a decision dated August 19, 2008, the Administrative Law Judge denied benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on January 30, 2009.

Plaintiff thereafter timely commenced this civil action. The record of administrative proceedings was filed in this Court on June 26, 2009. Plaintiff filed a statement of specific errors on July 28, 2009, to which the Commissioner responded on October 26, 2009. No reply brief has been filed, and the matter is now ripe for decision.

## II. Plaintiff's Testimony

Plaintiff was 41 years old at the time of the administrative hearing. The hearing began with questioning about her prior criminal record, which consists of a felony conviction for trafficking in marijuana. She testified that she continued to use marijuana for some time thereafter, on an occasional basis, but had not used it since her hospitalization. (Tr. 437-38). The hospitalization was related to multiple suicide attempts. (Tr. 440).

As far as her education and work history is concerned, plaintiff testified that she graduated from high school and completed almost three years of cosmetology school. She worked in that field from 1992 to 2004. Plaintiff testified that she could not do that work anymore because "the doctors put me off work." She stated that "I'm not able to do the things I have to do" to continue in that line of work. (Tr. 441-42).

Plaintiff testified that her physical problems are a result of a series of motor vehicles accidents in 1995, 2000, and September and December of 2004. Due to the motor vehicle accidents, she gradually deceased her working hours. (Tr. 443-44). She testified to pain in her legs, knees, back, hip, and neck, which worsened every year, causing her to work less and less. (Tr. 444). She gradually reduced her hours in approximately 2002 due to the worsening condition of her back and neck. (Tr. 456-57). Plaintiff also testified to constant aching knee pain, which ranged from 5-9 in intensity on a 0-10 scale. (Tr. 458-59). She had arthroscopic surgeries on both knees in 2006, neither of which was helpful. (Tr. 445).

At the time of the hearing, plaintiff weighed 240 pounds. She testified that she had recently lost approximately 60 pounds. The weight loss helped because she did not have to carry so much weight, but she did not notice less pain in her knees or her

back. (Tr. 463).

Plaintiff testified that she is able to sit an hour before her pain increases to where she becomes unable to tolerate it. For relief, she sometimes lies on the floor. (Tr. 454). She is able to walk about a block and stand for about one hour, after which she usually lies down. (Tr. 444, 459-460). She estimated she could lift about three pounds without significantly increasing her back pain.

Plaintiff testified that her daily activities are limited. She does not socialize with others because it makes her uncomfortable. (Tr. 464). She usually lies down 70% of the day. That is the most comfortable position for her because it takes pressure off her back. (Tr. 465). She does not get dressed three or four days out of the week because she has nowhere to go and nothing to do. (Tr. 465-66). When she is around other people, her temper may "snap" once or twice a week. (Tr. 466). Plaintiff also testified that she has panic attacks which occur approximately every two weeks and which last for several hours. During these attacks, her heart races and thumps and she feels scared and nervous. (Tr. 467). She goes out about once a week to go to the grocery store or to the gas station. (Tr. 468-69).

### III. The Medical Records

The pertinent medical records can be divided into those which relate to plaintiff's physical impairment and those which relate to her psychological impairments.

#### A. Physical Impairments

Dr. LeuVoy, plaintiff's primary care physician, completed a Basic Medical form in July 2004. At that time, he had last seen plaintiff on March 26, 2004. Dr. Leuvoy reported that plaintiff could stand and walk six hours out of an eight-hour workday without interruption. She could sit for two hours at a time, up to four hours per workday. She could frequently lift and carry

6-10 pounds and occasionally lift and carry 11-20 pounds. According to Dr. Leuvoy, plaintiff was moderately limited in bending, handling, and repetitive foot movements. Dr. LeuVoy opined that plaintiff was employable part time and at that time she was working six hours a day, three days per week. (Tr. 151-52).

The record contains treatment notes from Dr. Leuvoy from only November 9, 2004 to June 2, 2005. Dr. Leuvoy treated plaintiff for diabetes, asthma, high blood pressure, pain in her back, neck, knees and hands, gastroesophageal reflex and migraines. During this time, plaintiff gained over fifty pounds. (Tr. 241-250).

A July 21, 2004, lumbar spine MRI showed an interval development of central herniated disc at L4-5, causing moderate central canal stenosis and severe bilateral recess stenosis. (Tr. 196).

Plaintiff was involved in a motor vehicle accident on September 8, 2004. She was seen in the emergency room and diagnosed with a cranial contusion. A CT scan was negative for cervical and lumbar strains and depression. X-rays of plaintiff's cervical and lumbar spines showed minimal degenerative changes. (Tr. 157-60).

In November 2004, Dr. Rea, an orthopedic surgeon, saw plaintiff for complaints of pain in her back and down her legs with intermittent numbness and tingling. After examining plaintiff, Dr. Rea commented that "I have to admit that I would be in no hurry to operate on her. I think this woman is depressed and she might do just as well without surgery with a program aimed at weight loss, physical therapy, getting her off all of her medications and stopping smoking." (Tr. 198-210).

Dr. Rath reviewed plaintiff's records on behalf of the state on January 12, 2005. Dr. Rath noted that the medical records

showed spinal stenosis at the lumbar level by MRI.  He concluded that plaintiff could occasionally lift twenty pounds and frequently lift ten.  She could stand and walk for six hours out of an eight-hour workday and she could sit for the same period but needed to alternate between sitting and standing.  (Tr. 214-21).

An x-ray of plaintiff's right knee, taken on April 28, 2006 revealed tears of the medial and lateral menisci and joint effusion.  (Tr. 320).

Plaintiff first saw Dr. Hollingsworth on June 26, 2006.  On examination, she demonstrated an antalgic gait on the right with slight effusion and slight loss of full extension.  Dr. Hollingsworth recommended a right knee arthroscopy, which was performed on July 5, 2006.  (Tr. 298-303).  Following surgery, Dr. Hollingsworth reported that plaintiff was progressing well with range of motion and strengthening.  (Tr. 297).  A left knee MRI taken on July 19, 2006, revealed patella femoral chondromalacia, for which plaintiff underwent an arthroscopy on August 9, 2006.  (Tr. 290-96, 313-14).

Dr. LeuVoy prepared another Basic Medical form on which he noted that he had last seen plaintiff on July 21, 2006.  He reported that she had just undergone surgery on the right knee, and that an MRI of the left knee was scheduled.  In his opinion, plaintiff could walk or stand three hours a day but less than 30-60 minutes at a time, and she could sit for less than thirty minutes at a time for up to three hours a day.  She could lift and carry ten pounds frequently and twenty pounds occasionally.  According to Dr. LeuVoy, plaintiff was extremely limited in her ability to push and pull, to bend, and to perform repetitive foot movements, and she was markedly limited in her ability to handle and moderately limited in her ability to reach.  Dr. LeuVoy concluded that plaintiff was unemployable.  (Tr. 357-58).

When seen by Dr. Hollingsworth on August 31, 2006, plaintiff complained of right knee pain and weakness after having twisted that knee six weeks earlier. On examination, she demonstrated a right antalgic gait, slight effusion, and slight loss of full extension of the knee. (Tr. 288). A right knee MRI taken on September 11, 2006, showed prominent joint effusion. (Tr. 311-12). On September 19, 2006, Dr. Hollingsworth diagnosed a right knee strain and gave plaintiff a cortisone injection. (Tr. 287). In October, 2006, Dr. Hollingsworth reported no effusion or other abnormal findings, arranged for physical therapy, and prescribed ibuprofen. (Tr. 286).

The record contains additional medical evidence including records from Dr. Andrews, a pain specialist, and a lumbosacral spine MRI report. (Tr. 417-28). That evidence was not before the Administrative Law Judge. Rather, plaintiff submitted it to the Appeals Council. Because the Appeals Council denied plaintiff's request for review, that evidence is not a part of the record for purposes of the Court's substantial evidence review of the Commissioner's decision. See Cline v. Commissioner of Social Security, 96 F.3d 146, 148 (6th Cir. 1996).

B. Mental Impairments

Plaintiff was seen by Dr. Snyder, a psychiatrist, at Mid-Ohio Psychological Services on approximately eighteen occasions from October, 2004 through October, 2006. In October, 2004, plaintiff was crying and extremely distraught over a friend's poor health. Dr. Snyder reported plaintiff was stable in December, 2004 and February, 2005, but seemed frustrated in April, 2005, because her son's probation officer had told her that her son was attending AA meetings too frequently. (Tr. 237-40). A series of medication adjustments followed. (Tr. 382, 384-85, 387). In December 2005, Dr. Snyder noted that plaintiff had improved quite a bit. She was prescribed Risperdal to help

her sleep and because she was experiencing racing thoughts. Some concern was expressed about her continued use of Xanax. (Tr. 380). In January 2006, Dr. Snyder noted plaintiff was doing "quite well." (Tr. 379). In April 2006, she was experiencing severe physical pain as well as anxiety over losing her medical card when her son turned eighteen. (Tr. 376). In May, 2006, plaintiff reported that she could not sleep so Dr. Snyder prescribed Lunesta. (Tr. 373). In August 2006, Dr. Snyder indicated that plaintiff was "doing very well" other than experiencing post-surgical knee pain. (Tr. 367). On October 19, 2006, plaintiff did "not endorse any depression" and felt "that her depression and anxiety are very well controlled." (Tr. 366).

Plaintiff also was seen by therapists at Mid-Ohio Psychological Services. Plaintiff saw Bonnie Daniels from August 2005 through November 2005. (Tr. 381, 383, 386, 389, 391). Beginning in January 2006, Plaintiff began seeing therapist Mike Selegue. (Tr. 378). In March 2006, Mr. Selegue observed a depressed mood and affect. Plaintiff was walking with an unsteady gait and appeared to have back pain. She expressed concerns about her son who was in juvenile detention and was tearful when discussing his situation. She ended the session abruptly due to back and leg pain. Mr. Selegue noted that plaintiff continued to struggle with day-to-day stressors and lacked support to manage them. (Tr. 377). In April, 2006, plaintiff presented with a mildly depressed mood and appropriate affect. (Tr. 375). Treatment notes in May, June, and July indicated a depressed mood. (Tr. 374, 372, 369). In November 2006, plaintiff was lethargic and unmotivated to pursue treatment. In response to intervention, Mr. Selegue noted that it seemed plaintiff's motivation was primarily for medication, but it was not clear how she benefitted from the medication. Mr. Selegue also noted that she continued to function fairly

-7-

successfully outside of the office, as there were no significant reports of violations of the law or other problems in the community. (Tr. 359).

Plaintiff underwent a psychological evaluation by Dr. Miller in January 2005. Plaintiff reported that she was unable to work due to her psychiatric and health problems. Her problems were noted to be anxiety, depression, temper outbursts, withdrawal, and moodiness. Her facial expression was tense and strained. Dr. Miller reported that plaintiff appeared quite depressed and anxious. Plaintiff tended to focus on her pain and breathing problems. Dr. Miller diagnosed a generalized anxiety disorder, moderate, dysthymic disorder, moderate and a panic disorder without agoraphobia. He assigned plaintiff a Global Assessment of Functioning score of 45 and believed that plaintiff was moderately impaired in her ability to interact with coworkers, supervisors, and the public and in her ability to maintain attention span and concentration. Further, she was moderately to markedly impaired in her ability to deal with stress and pressure in a work setting due to her anxiety. Her task completion abilities were also impaired. (Tr. 230-33).

Plaintiff's records were reviewed by Dr. Lewin, a state agency psychologist, in July 2005. Dr. Lewin reported that plaintiff had mild impairments in her activities of daily living, moderate impairments in social functioning, and moderate impairments in concentration, persistence and pace. Dr. Lewin found no episodes of decompensation. Dr. Lewin concluded that plaintiff was capable of simple to moderately complex task completion at a reasonable pace with intermittent and occasional interactions with others. (Tr. 267-80).

A consulting psychologist, Dr. Ostrander, examined plaintiff and reported in October, 2006, that plaintiff's affect was depressed and her mood was fairly flat. Plaintiff's grooming and

attire were generally appropriate.  Her eye contact was
appropriate and her speech was normal in pitch and pace but soft.
Plaintiff's vocabulary seemed adequate.  Her attitude was open
and responsive throughout and her recent and remote recall
appeared grossly intact.  Plaintiff's general fund of knowledge
and abstract reasoning appeared below average and her
intelligence was estimated in the low average range.  Dr.
Ostrander reported no evidence of bizarre or psychotic thought
processes and no evidence of suicidal or homicidal ideation.  Dr.
Ostrander diagnosed plaintiff with a major depressive disorder,
recurrent, and of moderate to severe symptomology, as well as a
generalized anxiety disorder.  Dr. Ostrander concluded that at
the time of the assessment, it appeared that plaintiff's level of
depression would interfere with her ability to secure or maintain
employment based on her reported history of not maintaining
adequate hygiene, not showering for up to a week or brushing her
hair, rarely getting out of bed, and having no interest being
around people.  He also reported that plaintiff's appetite and
sleep were significantly disturbed and that she was often so
anxious that she was unable to shop by herself.  (Tr. 360-65).

Plaintiff was admitted to Fairfield Medical Center for
observation in August 2007, due to substance abuse or a possible
drug overdose.  She had been hoarding Xanax and Percocet, and
tested positive for benzodiazepines, opiates, and cannabinoids.
One of the emergency room physicians, Dr. Hazlip, reported that
plaintiff was intentionally uncooperative.  Dr. Ginty directed
that plaintiff receive nothing for pain but Tylenol or Ultram.
This order was confirmed by a psychiatrist, Dr. Stergiou, because
of the potential for medication abuse.  (Tr. 327-56).

Plaintiff was again evaluated by Dr. Ostrander on January
21, 2008.  Dr. Ostrander reported that plaintiff's grooming and
attire were appropriate, her eye contact was good, her attitude

was open and positive, and her recall appeared grossly intact. Her speech was soft and slow. He estimated her intelligence to be in the borderline to low average range. Plaintiff's affect and mood were depressed, sad, and tearful, and she acknowledged suicidal ideation, but she was sufficiently motivated by her son and mother to not harm herself. Plaintiff reported she only showered two to three times per week, and those were the only days she got dressed. She did not generally do anything with her hair or make-up, and did not clean house often. She did laundry every one to two weeks and went to the grocery every two weeks or so, but was too afraid to go by herself. When she did go out, she experienced symptoms of racing thoughts, a pounding heart, and chest tightness with trouble breathing. She cooked approximately once per week. Dr. Ostrander diagnosed plaintiff with a major depressive disorder, recurrent, severe, without psychotic features, and anxiety that might represent a panic disorder. Dr. Ostrander opined that plaintiff's symptoms appeared severe enough that they would interfere with her ability to secure or maintain employment. (Tr. 400-05).

Dr. Ostrander also completed a mental functional capacity assessment form. On the form, he found plaintiff not significantly limited in nine categories, moderately limited in six, and markedly limited in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruption from psychological based symptoms and to perform at a consistent pace without a unreasonable number of length of rest periods; and to interact appropriately with the general public. Dr. Ostrander concluded that plaintiff was unemployable for twelve or more

months.  (Tr. 406-07).

## IV. The Expert Testimony

A medical expert, Dr. Walter Miller, testified at the administrative hearing. He stated that from a physical standpoint, plaintiff would be capable of sedentary work, even with her knee and back problems.  Dr. Miller also testified that there was no basis for Dr. LeuVoy's July 2006, contrary opinion. Dr. Miller further testified that the circumferential bulge seen on the July, 2004 MRI could cause moderate problems and bilateral stenosis.  However, he also stated that "no doctor did anything with" the finding.  If there were a pathological cause, there should have been records demonstrating problems with plaintiff's legs and feet or marked neurological changes.  (Tr. 470-75).

A vocational expert, Mr. Schweihs, also testified at the administrative hearing.  He was asked to consider a hypothetical individual who was limited to working at the sedentary exertional level and who could not work at unprotected heights or dangerous moving machinery.  Such a person could work as a cashier, information clerk, assembler, packager, or inspector.  (Tr. 477). If that person also were limited in her ability to deal with the public and with supervisors and co-workers, and could do only simple, unskilled tasks, she could still do a number of assembly jobs or inspection jobs.  (Tr. 478).  If she had additional limitations involving not staying on task or lying down during the day, she could not sustain competitive employment.  (Tr. 479)

## V. The Administrative Decision

In the administrative decision, the Commissioner found, first, that plaintiff was insured for disability insurance purposes through June 30, 2009.  Second, the Commissioner found that plaintiff suffered from severe impairments including degenerative disc disease, arthritis in bilateral knees status post arthroscopic surgery bilaterally, diabetes, depression, and

-11-

marijuana abuse.  As a result of these impairments, plaintiff was able to work only at the sedentary exertional level.  Further, form a psychological viewpoint, she was limited to simple, unskilled work with no public contact and no more than superficial contact with supervisors and co-employees.  With these limitations, plaintiff would not be able to perform any past relevant work.  Because the vocational expert testified that plaintiff could perform jobs that exist in significant numbers in the economy, however, plaintiff was found not to be disabled.

VI.   Legal Analysis

In her statement of errors, plaintiff raises issues about the Commissioner's findings concerning both her physical and her mental limitations.  First, she argues that the Commissioner's decision did not properly take into account the evidence that she suffers from spinal stenosis and the fact of her obesity.  Second, she argues that the Commissioner had no basis for rejecting Dr. Ostrander's opinion about her marked inability to perform numerous work-related mental activities.  These contentions are evaluated under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be   conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Secretary's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir.

-12-

1984).  In determining whether the Secretary's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Secretary's decision must be affirmed so long as his determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

As to her spinal stenosis, plaintiff notes that MRI studies done in both 2004 and 2008 document the existence of both spinal and lateral recess stenosis.  She further points out that the 2004 study showed a worsening of the condition since 2001 and attributed the stenosis to an L4-5 herniated disc.  She observes that Dr. Miller, the testifying orthopedic surgeon, incorrectly concluded that the abnormalities seen on the MRI studies were not causing stenosis, and she contends that the Commissioner's finding that the x-ray findings did not document stenosis is incorrect.  Finally, she contends that because the opinion of her treating physician, Dr. LeuVoy, was based in part on the severity of her stenosis, and the Commissioner relied on Dr. Miller's erroneous testimony about stenosis to discount that opinion, the Commissioner lacked an adequate basis for rejecting Dr. LeuVoy's conclusions about her physical capabilities.

The Commissioner concedes that the statement made in the administrative decision regarding the absence of evidence of stenosis is not entire accurate.  On the other hand, the Commissioner argues that it is not so much the diagnosis as the symptoms that are important, and Dr. Miller clearly testified that there was little evidence that any stenosis was symptomatic.

-13-

The Commissioner also contends that Dr. LeuVoy's 2006 opinion of disability was not well-supported and could be discounted for that reason.

It is well-established that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). On the other hand, a physician's statement that plaintiff is disabled is not determinative of the ultimate issue. The weight given to such a statement depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. §404.1527; Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985). In evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).

As explained in Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007), "[t]here is an additional procedural requirement associated with the treating physician rule." Under this procedural requirement, the Commissioner must clearly articulate both the weight given to the treating physician's opinion and the reasons for giving it that weight. Two reasons underlie this procedural requirement. First, it assists the claimant to understand why the Commissioner has concluded, contrary to what the claimant has been told by his or

her treating doctor, that the claimant is not disabled.  Second, it ensures that the Commissioner has correctly applied the substantive law applicable to opinions of treating sources and that an appellate court can review that application in a meaningful way.  Id.

Where the Commissioner does not follow this procedural requirement at the administrative level, the Court cannot simply fill in the required analysis based on the evidence of record.  Rather, "[b]ecause of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  Id. at 243, citing Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, notwithstanding the Commissioner's failure to list spinal stenosis as a severe impairment, the Commissioner did consider whether plaintiff's back condition in general, including stenosis, significantly limited her ability to perform work-related physical activities.  Dr. Miller noted the existence of stenosis but discounted its impact, stating that if this were a condition that was causing plaintiff to suffer from limitations in her ability to function, he would have expected some treatment directed to the condition.  Instead, as he observed, had the stenosis being caused by her bulging disc been symptomatic, he would have expected to see, in the records, "problems with her legs and her feet or marked neurological changes" and that "there should be more records to back this up."  (Tr. 474).  Instead, there were no records, leading him to conclude that "it's a finding that no doctor did anything with."  Id.  Thus, the

Commissioner did not err in failing to attribute significant limitations to plaintiff's stenosis.

The Commissioner was entitled to discount Dr. LeuVoy's opinion of disability for much the same reason. When asked about the opinion, Dr. Miller commented that he did not see a basis for such severe restrictions on plaintiff's ability to stand, walk or sit for a full work day. (Tr. 474). The administrative decision noted that Dr. LeuVoy last saw plaintiff in 2006, which was prior to one of her knee surgeries, and that he did not have the benefit of the full medical record when he determined she could not work. These are valid reasons to give less than controlling weight to his opinion. It should further be noted that Dr. LeuVoy's earlier opinion, rendered in 2004, supported a finding that plaintiff could do essentially a full range of light work (involving standing or walking for up to six hours in a workday and sitting for up to four hours, as well as lifting and carrying up to 20 pounds occasionally and ten pounds frequently), but the Commissioner found that she was limited to sedentary work only, so that a substantial amount of weight was given to Dr. LeuVoy's findings. For all of these reasons, the Court concludes that the claim that the Commissioner did not adequately deal with the evidence concerning plaintiff's stenosis and the 2006 opinion of Dr. LeuVoy lacks merit.

The other issue concerning plaintiff's physical abilities relates to her obesity. The records indicate that plaintiff had experienced significant weight gain, and that her weight may have varied from 220 to 240 pounds. She is 5'6" tall. Plaintiff argues that the Commissioner is required, under applicable regulations and rulings, to take obesity into account in determining how a claimant may be able to do routine physical activity, and that the failure even to mention her obesity is an error that requires a remand.

Certainly, there is no procedural requirement such as 20 C.F.R. §404.1527 which mandates that the administrative decision articulate a rationale for concluding that a claimant's obesity is not, by itself or in conjunction with other impairments, disabling.  As the decision cited by the Commissioner, <u>Sharbek v. Barnhart</u>, 390 F.3d 500 (7th Cir. 2004), held, the fact that an administrative decision does not explicitly mention obesity is not itself a basis for remand.  Rather, the error to mention that factor, if it error at all, is harmless where it is clear that the record alerted the ALJ to the existence of the claimant's obesity, where the medical sources on whom the ALJ relied took it into account, and where there is no evidence about how the claimant's obesity would affect his or her ability to work.  <u>Id</u>. at 504.  Likewise, in this case, Dr. Miller was aware of plaintiff's obesity when he formulated his opinion that she was limited to sedentary work, and she has not pointed to any evidence in the record suggesting that her ability to do that type of work is limited by her obesity.  Consequently, this claim, too, is insufficient to require a remand.

As far as plaintiff's mental impairment is concerned, she notes that both Dr. Miller (the psychologist, not the testifying expert) and Dr. Ostrander believed that she would be essentially unable to withstand the stress of daily work activity.  She asserts that the Commissioner's rejection of their opinions as inconsistent with the evidence of record does not specify how, exactly, their opinions are contradicted by other evidence, and that the Commissioner's declaration that the decision of employability is reserved to the Commissioner does not explain why the Commissioner also rejected the professionals' opinions about the limitations caused by plaintiff's mental impairments.

In response, the Commissioner argues (and the Court agrees) that the administrative decision represents a fair reconciliation

-17-

of conflicting medical records on the issue of the severity of
plaintiff's mental impairment.  Interestingly, Dr. Snyder, the
treating psychiatrist, frequently reported that plaintiff was
stable or that she was doing "quite well."  Many of her problems
had to do with issues with her teenaged son.  She often responded
well to medication or medication changes and sometimes denied
depressive symptom.  Dr. Lewin, the state agency psychologist,
believed plaintiff's mental limitations to be no more than
moderate.  Even Dr. Miller, upon whose opinion plaintiff relies
heavily, imposed only one "moderate to marked" limitation,
dealing with work stress, which he attributed to anxiety, but her
anxiety level was described as mild to moderate.  (Tr. 230).  Dr.
Ostrander was the only examining source whose opinion was
completely incompatible with work activity, and she was not a
treating source.

The Commissioner did accommodate plaintiff's mental
limitations by restricting her to simple tasks in an environment
involving little or no contact with others.  In light of the
various views expressed as to her work ability, this is not an
unreasonable accommodation.  Certainly, it would have been better
for the administrative decision to articulate as clearly as the
Commissioner's memorandum all of the reasons why Dr. Ostrander's
conclusions were not accepted - for example, that much of it was
based on the plaintiff's own report of symptoms, but she was
found by the ALJ not to be entirely credible - but there is no
requirement in this judicial circuit that the administrative
decision articulate the complete basis for rejecting the opinion
of a non-treating source.  See Kornecky v. Comm'r of Social
Security, 167 Fed. Appx. 496 (6th Cir. February 9, 2006); see
also Bollenbacher v. Comm'r of Social Security, 621 F.Supp.2d
497, 502 (N.D. Ohio 2008).  Thus, although the administrative
decision in this case is fairly sparse, the conclusions it

reaches concerning plaintiff's mental and physical capabilities are supported by substantial evidence. Because that is so, the administrative decision must be affirmed.

## VII. Conclusion

Based on the foregoing, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner.

## VIII. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).


/s/ Terence P. Kemp

United States Magistrate Judge